**James Rolf BJERKAN,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 74–2039.**

United States of Appeals,
Seventh Circuit.

Argued Sept. 23, 1975.

Decided Nov. 18, 1975.

---

Curry First, Milwaukee, Wis., for plaintiff-appellant.

Samuel K. Skinner, U. S. Atty., Michael D. Groark, Asst. U. S. Atty., Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

As it developed, the only question in this appeal from the denial of habeas corpus type relief under 28 U.S.C. § 2255 concerns whether a presidential pardon granted after the decision on this petition in the district court moots the appeal.

## I

The petitioner, James Rolf Bjerkan, was convicted of refusing to report for induction into the Armed Forces in violation of 50 U.S.C. App. § 462(a). His conviction was affirmed by this court on March 9, 1973, 7 Cir., 474 F.2d 1351, *cert. denied*, 414 U.S. 1022, 94 S.Ct. 444, 38 L.Ed.2d 312. On January 4, 1974, when he began his incarceration, his sentence was reduced from three years to eighteen months. On March 20, 1974, he filed the petition in question here under 28 U.S.C. § 2255 which was decided below on November 6, 1974. In the meantime, Bjerkan had been furloughed by the Presidential Clemency Board. This appeal was filed in November and on December 28, 1974, the President, through the Attorney General, granted the petitioner a full and unconditional pardon.

During oral argument, the possibility was raised that the case had become moot due to the pardon. The court requested supplemental briefs on the question and after a review of the briefs and the applicable law we conclude that the case is moot.

## II

When the petition was filed Bjerkan was in custody in the correctional institution at Sandstone, Minnesota, establishing jurisdiction for the district court to consider § 2255 relief. *Carafas v. LaVallee*, 391 U.S. 234, 238, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). Prior to any decision, Bjerkan was released from custody by action of the Clemency Board. This fact, however, did not defeat the district court's jurisdiction nor did it moot the petition. *Id.* The Court in *Carafas* held that even though the petitioner had completed serving his sentence shortly prior to consideration of his appeal by the Supreme Court, the case was neither moot nor was jurisdiction defeated.

> In consequence of his conviction, he cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; he cannot serve as a juror. Because of these "disabilities or burdens [which] may flow from" petitioner's conviction, he has "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." *Fiswick v. United States,* 329 U.S. 211, 222 [67 S.Ct. 224, 230, 91 L.Ed. 196] (1946). On account of these "collateral consequences," the case is not moot.

*Id.* at 237–38, 88 S.Ct. at 1559 (footnotes omitted).

Clearly, when Bjerkan was only furloughed, his petition was still viable because he faced serious "collateral consequences" from his conviction. After his pardon, however, it is not so clear that these consequences remain. Thus, we must determine whether a full pardon eliminates all "collateral consequences" of the petitioner's conviction.

## III

Obviously, a pardon cannot erase the basic fact of conviction, nor can it wipe away the social stigma that a conviction inflicts. These, however, were not the "collateral consequences" which concerned the Court in *Carafas.* The "collateral consequences" noted in *Carafas* were of a substantial nature, consisting of deprivation of a person's basic rights,

the right to work in certain professions, the right to vote and the right to serve on a jury. Clearly, then, although the pardon will not render the petitioner innocent, if it restores all his basic civil rights, both state and federal, it will do away with the "collateral consequences" of his conviction.

The pardon granted petitioner was full, free and unconditional. It represented an exercise of the President's pardon power to its full measure.[1] The Clemency Board noted that the pardon restored all of petitioner's federal civil rights and the cases support this view. As the Supreme Court in *Knote v. United States*, 95 U.S. 149, 153, 24 L.Ed. 442 (1877), wrote, "[a pardon] releases the offender from all disabilities imposed by the offense, and restores him to all his civil rights." And as was noted in *Armstrong v. United States*, 80 U.S. (13 Wall.) 154, 156, 20 L.Ed. 614 (1871), a pardon is "a public act of which all Courts of the United States are bound to take notice, and to which all Courts are bound to give effect." The difficult question which we face is whether a federal pardon restores petitioner's state civil rights.

The Presidential Clemency Board in its letter to the petitioner regarding the granting of his pardon made evident its view that the pardon could not, in and of itself, restore the petitioner's state civil rights. The Board wrote:

> The pardon will restore all federal civil rights which you lost upon your criminal conviction, including the right to run for Federal office. You will also find your pardon *helpful* in restoring certain state civil rights, such as your right to vote and to obtain a license to work in certain occupations from which you are now barred by state law. (Emphasis added)

If the Board's view were correct, serious collateral consequences would remain and this appeal would continue to be viable.

The Supreme Court has dealt with the relationship of the federal pardon power to the states only once, in *Carlesi v. New York*, 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914). In that case, the courts of New York had convicted and sentenced Carlesi as a second offender relying on a prior federal conviction, which had been pardoned, as constituting the first offense. Carlesi claimed that this use of a pardoned conviction violated the federal pardon power. The Court took a very narrow view of the question, noting the wide discretion which states have in punishing crimes and prescribing appropriate penalties. It held the sentencing as a second offender permissible because such a sentence did not impose "an additional punishment on crimes for which [the petitioner] had already been convicted and punished [and pardoned]" but rather imposed "punishment . . . for the new crime only." *Id.* at 58, 34 S.Ct. at 578.

In reaching this result, the Court noted that the states could not ignore a federal pardon. In fact, under most circumstances the states were bound by it. The Court wrote:

> It may not be questioned that the States are without right directly or indirectly to restrict the national government in the exertion of its legitimate powers. It is therefore to be conceded that if the act of the state in taking into consideration a prior conviction of an offense committed by the same offender against the laws of the United States despite a pardon was in any just sense a punishment for such prior crime, that *the act of the state would be void because destroying or circumscribing the effect of the pardon granted under the Constitution and laws of the United States.*

*Id.* at 57, 34 S.Ct. at 577 (emphasis added).

Thus, the Court established that after a pardon, a state may not take cognizance of the offense pardoned in any way

**1.** *U.S.Const.* art. II, § 2, provides in part:
[The President] shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment.

which would constitute a "punishment." The Court, however, did not elaborate on what it considered to be a "punishment."

Common sense would seem to indicate that the deprivation of certain basic civil rights resulting from a felony conviction constitutes a "punishment." However, we need not rely entirely on common sense, as the Supreme Court in an early case has spoken on the subject. In *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866), the Court faced a Missouri constitutional provision which required all persons holding any office of honor or profit under the state or any position of consequence in the professions, teaching, business or religion to subscribe to a lengthy oath dealing with the person's prior sentiments and feelings toward the Confederacy. Failure to take the oath disqualified the person from any of these livelihoods. The Court held that "[t]he disabilities created by the constitution of Missouri must be regarded as penalties—they constitute punishment." *Id.* at 320. The Court went on to note that "[t]he deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact." *Id.* And the Court concluded:

> The theory upon which our political institutions rest is, that all men have certain inalienable rights—that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to everyone, and that in the protection of these rights all are equal before the law. *Any deprivation or suspension of any of these rights for past conduct is punishment, and can be in no otherwise defined.*

*Id.* at 321–22 (emphasis added).

■■ Therefore, any deprivation of a person's basic civil rights, including the right to vote, the right to serve on juries and the right to work in certain professions, by a state on account of a federal conviction would constitute a punishment.[2] If the conviction were pardoned, as it was here, such attempted punishment would constitute a restriction on the legitimate, constitutional power of the President to pardon an offense against the United States and would be void as circumscribing and nullifying that power. *Carlesi v. New York, supra.*

■ This result corresponds with established notions regarding the supremacy clause.[3] Chief Justice Marshall in *McCullock v. Maryland*, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), laid the foundation for interpretation of the clause:

2. A pardon does not "blot out guilt" nor does it restore the offender to a state of innocence in the eye of the law as was suggested in *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 380, 18 L.Ed. 366 (1866). *See Burdick v. United States*, 236 U.S. 79, 91, 35 S.Ct. 267, 59 L.Ed. 476 (1915) (suggesting that, far from blotting out guilt, the acceptance of a pardon may constitute a confession of guilt). We accept the view of the effect of a pardon propounded by Professor Williston in *Does A Pardon Blot Out Guilt?* 28 Harv.L.Rev. 647, 653 (1915):

> The true line of distinction seems to be this: The pardon removes all legal punishment for the offense. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of a crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

Thus, the fact of conviction after a pardon cannot be taken into account in subsequent proceedings. However, the fact of the commission of the crime may be considered. Therefore, although the effects of the commission of the offense linger after a pardon, the effects of the conviction are all but wiped out.

3. *U.S.Const.* art. VI, cl. 2, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.

In regard to the pardon power, the President's sphere is limited. He can only pardon those offenses which are "against the United States." But in this sphere, his power, like any constitutional power, must be supreme. It cannot be hindered by the operation of the subordinate governments. The pardon power would be ineffective if it could only restore a convict's federal civil rights. The pardoned person would still suffer numerous handicaps and would not receive the benefits of what the President in granting a full pardon would seem to intend—that the person be reinstated to his full rights as a citizen. In *McCulloch*, Chief Justice Marshall noted that the power to tax is the power to destroy. *Id.* Here the power to punish for a conviction which has been pardoned is the power to vitiate and destroy a presidential pardon.[4] For these reasons, we conclude that a presidential pardon restores state as well as federal civil rights.[5] Since a state may not deprive a pardoned felon of his basic civil rights, we find that the petitioner here faces no "collateral consequences" of the nature contemplated in *Carafas v. LaVallee, supra.* Thus, the appeal is moot.

The order denying the petition for habeas corpus is vacated and the cause is remanded to the district court with directions to reinstate the cause on its calendar so that it can be dismissed as moot.

Vacated and remanded.

FAIRCHILD, Chief Judge (dissenting).

The Presidential Pardon received by Mr. Bjerkan does not remove all of the "collateral consequences" of his conviction. Therefore, I am unable to agree with the majority that this case is now moot. In *Carlesi v. New York*, 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914) the Court held that a state could take "into consideration a prior offense committed against the United States after pardon" as long as the state's action did not constitute a punishment. *Carlesi, supra*, at 57, 34 S.Ct. 577. The assignment by the state of "second offender status" to the appellant did not impair the effect of his pardon for the first offense. In addition to the "status" consequences which a state may still impose on Mr. Bjerkan, he may be subject to other disqualifications which do not constitute punishments. In *United States v. Nasser*, 476 F.2d 1111, 1117 (1973), this court held that " . . . where there is a sufficiently rational relationship between the past activity and the public interest in excluding unworthy people, the disqualification is not a punishment . . .." Therefore, Mr. Bjerkan's pardon may not immunize him from disqualifications by state licensing agencies. The new Federal Rules of Evidence, Fed.Rules Evid. Rule 606, 28 U.S.C., for example, may not preclude the impeachment of testimony which he may give in subsequent unrelated trials. The totality of these collateral consequences is substantial enough to make this appeal ripe for a decision.

In reaching the merits of Mr. Bjerkan's appeal, however, I would vote to affirm the decision of the district court. The major issue which Mr. Bjerkan raised in this appeal was the failure of the local board and the National Selective Service Board to state the reasons why Mr. Bjerkan was denied conscien-

---

**4.** Chief Justice White noted this fact in *Carlesi, supra*, 233 U.S. at 57, 34 S.Ct. 576.

**5.** The only federal authority on point holds to the contrary. *See Pardons*, 7 Op.Atty.Gen. 760 (1856). For the reasons stated above, we find this opinion unconvincing and, of course, we are not bound by it. Also, we note the fact, as commented upon in Redish & Woods,

*Congressional Power to Control the Jurisdiction of Lower Federal Courts: A Critical Review and a New Snythesis*, 124 U.Pa.L.Rev. 45, 97–100 (1975), that "[t]he philosophy of federalism has shifted dramatically" since the time of the Civil War and that this "new atmosphere surrounding state-federal relations" has had a distinct impact on interpretations of federal supremacy.

tious objector status. This omission was remedied, however, by the State Appeal Board's explanation for denying this appeal. Neither *United States v. Wainscott*, 496 F.2d 356 (4 Cir. 1974) or *United States v. Lemmens,* 430 F.2d 619 (7 Cir. 1970) require a different analysis. The reasons for the denial of Mr. Bjerkan's appeal articulated by the State Appeal Board were adequate for the purpose of both judicial and administrative review.