**UNITED STATES of America,
Appellant,**

v.

**Gregory Paul NOONAN, Appellee.**

**No. 90–3015.**

United States Court of Appeals,
Third Circuit.

Argued May 24, 1990.

Decided June 28, 1990.

---

Thomas W. Corbett, Jr., U.S. Atty., Bonnie R. Schlueter (argued), Asst. U.S. Atty., for appellant.

Jon Pushinsky (argued), Pittsburgh, Pa., for appellee.

Before COWEN, NYGAARD and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This case of original impression requires us to consider the effect of a 1977 proclamation by President Jimmy Carter granting a pardon for violations of the Military Selective Service Act between August 4, 1964 and March 28, 1975. Specifically, we are to decide whether one convicted of violating provisions of that Act is entitled to an expunction of all court records relating to his conviction by virtue of receiving the Presidential pardon. The district court granted the motion to expunge. The government has appealed and we reverse.

Jurisdiction was proper in the trial court based on 18 U.S.C. § 3231. Jurisdiction on appeal is proper based on 28 U.S.C. § 1291. The appeal was timely filed under Rule 4(b) F.R.A.P.

## I.

Article II, § 2 of the Constitution provides in part: "[The President] shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment."

On January 21, 1977, President Carter issued Proclamation 4483, which states in relevant part:

Acting pursuant to the grant of authority in Article II, Section 2, of the Constitution of the United States, I, Jimmy Carter, President of the United States, do hereby grant a full, complete and unconditional pardon to: (1) all persons who may have committed any offense between August 4, 1964 and March 28, 1973 in violation of the Military Selective Service Act or any rule or regulation promulgated thereunder; and (2) all persons heretofore convicted, irrespective of the date of conviction, of any offense committed between August 4, 1964 and March 28, 1973 in violation of the Military Selective Service Act, or any rule or regulation promulgated thereunder, restoring to them full political, civil and other rights.

## II.

In 1969, Gregory Paul Noonan was convicted and sentenced to three years imprisonment for failure to submit for induction in 1968, a violation of the Military Selective Service Act. Upon appeal, this court affirmed the conviction in a published opinion, *United States v. Noonan*, 434 F.2d 582 (3d Cir.1970) (Aldisert, J.), *cert. denied*, 401 U.S. 981, 91 S.Ct. 1190, 28 L.Ed.2d 333 (1971).

On January 21, 1977, President Jimmy Carter issued Proclamation 4483, pardoning Noonan's 1968 Selective Service Act violation. Eleven years later, on December 22, 1988, Noonan moved to expunge records of his Selective Service Act conviction. In his motion, Noonan stated that he is currently employed as a parts manager for a car dealership, but that his "arrest and conviction has arisen under circumstances which could be detrimental to Mr. Noonan's pursuit of employment or other goals beneficial to his family." App. at 6. He further averred that he has never been the subject of criminal proceedings other than the Selective Service Act case. *Id.*

Noonan sought two forms of relief. In the motion itself, Noonan expressed the belief that expunction of his record "would enable him to answer in the negative any questions relating to whether or not he has ever been arrested and/or convicted." App. at 6. In his prayer for relief, he requested that the district court order that he "may, as all others must, consider the criminal indictment expunged as if it had never occurred." *Id.* at 7. Noonan also requested that all records relating to his arrest and conviction be delivered to the Clerk of the United States District Court for the Western District of Pennsylvania and that the Clerk be directed to impound and seal the records. *Id.*

On March 8, 1989, the district court entered an order granting Noonan's motion. On March 16, 1989, the government moved for reconsideration. The district court then scheduled a hearing for May 25, 1989, to develop a factual record. At the hearing, Noonan described his need for expunction of his criminal record.

Although employed in the automotive parts business for thirteen years, he also said that "it's a business where there's an awful lot of turnover, and more than likely in the next several years I will probably be looking again." *Id.* at 93. Noonan stated that, in the past, when he had been required to disclose his conviction record on an application form, he had been abruptly rejected for the position.

Noonan also testified that he suffered emotional problems as a result of his imprisonment for the conviction. He has been treated for depression by psychiatrist Oscar Urrea and he has been counseled by psychologist Jim Burns. According to Noonan, both recommended that he seek expunction of his conviction as a means of "burying the past and sort of relieving the pressure." *Id.* at 97.

The government presented no evidence at the hearing. Defense counsel sought and obtained court permission to submit a deposition of Dr. Urrea following the hearing.

Dr. Urrea testified that he began treating Noonan on April 15, 1988. He at first diagnosed Noonan as suffering "in the foreground from a generalized anxiety disorder, and ... in the background ... from a personality disorder." *Id.* at 40. Later, Dr. Urrea "decided that he's not just a compulsive personality disorder but a group of personality disorders in one." *Id.*

According to Dr. Urrea, there are two circumstances which have aggravated Noonan's conditions: his family history and "the issue with the military." *Id.* at 43. With respect to the family history, Dr. Urrea pointed out that Noonan's father also suffers from depression, an anxiety disorder and obsessional traits and noted that Noonan's grandmother committed suicide.

With respect to the "issue with the military," Dr. Urrea testified:

> Mr. Noonan has been a social outcast ever since he refused to be inducted into the army, into the service, and that has created a significant negative image on him.

> His self-esteem is very poor. He's not able to—he has not been able to consistently hold onto a job. He has medical problems. He drinks a lot. He has had intermittent thoughts of suicide. He's just a very unhappy man, and the very first thing that he worries about when he's going to look for a job, when he's going to undertake something, is the fact

that he will have to disclose his criminal record.

*Id.* at 43–44.

Dr. Urrea advised him to confer with a lawyer about the possibility of clearing his record. On cross-examination, Dr. Urrea described Noonan's family history as the "biological background" of his problems, and the "problem with the U.S. Government [as] the trigger factor." *Id.* at 57.

Although the government presented no evidence, it objected to the testimony of Noonan and Dr. Urrea as irrelevant. The government relied upon its legal argument that the district court's inherent power to expunge a criminal record cannot be exercised under the circumstances presented by Noonan.

The district court issued its opinion denying the government's motion for reconsideration on December 5, 1989. Relying upon *Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 374, 18 L.Ed. 366 (1866), it held that the Presidential pardon entitled Noonan to expunction of his criminal record because the pardon "'blots out of existence the guilt' of Gregory Paul Noonan." App. at 27.

### III.

The government argues that the district court lacked the power to expunge the criminal record on the basis of the pardon. Alternatively, the government argues that this particular case is not one warranting expunction. Subsumed in its contention is the notion that the President has the power, as head of the executive branch, to order, explicitly or implicitly, expunction of a criminal record.

The centerpiece of Noonan's argument is that a pardon "blots out of existence the guilt." *Ex Parte Garland, supra,* 71 U.S. at 380, and that the terms of the Carter Presidential pardon, restoring to Noonan full "other rights" as well as "full political [and] civil ... rights" constitutes the legal authority for expunging his criminal conviction record.

### IV.

To reach Noonan's argument we must first surmount a very difficult hurdle of whether the executive branch of government has the power, directly or indirectly, to expunge a judicial branch record. This, too, is a question of first impression in the United States. English courts have met the issue head-on and resolved it in the negative. In *R. v. Foster,* [1985] 1 QB 115, [1984] 2 All ER 679, [1984] 3 WLR 401, 79 Cr.App.Rep. 61, the Court of Appeal, Criminal Division explained:

> [Counsel for the Crown] reminded us that constitutionally the Crown no longer has a prerogative of justice, but only a prerogative of mercy. It cannot, therefore, he submits, remove a conviction but only pardon its effects. The Court of Appeal (Criminal Division) is the only body which has statutory power to quash a conviction. With that we entirely agree.

*R. v. Foster, supra,* at 130. Likewise, in the context of our tradition, our law, and our constitutional doctrine—be it state or federal—the executive branch has never possessed "a prerogative of justice." That has always been the exclusive province of the Third Branch of government, the judiciary.

It is well established under our tripartite constitutional system of government that the President stands under the law. The President's power, if any, to issue an order of expunction of a criminal record must stem either from an act of Congress or from the Constitution itself. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865–66, 96 L.Ed. 1153 (1952). There is no statute that expressly authorizes the President to tamper with judicial records or to create any fiction through the pardon power vested in him or her through Article II, § 2. The power to pardon is an executive prerogative of mercy, not of judicial record-keeping.

We must heed the words of Baron de Montesquieu, the eighteenth century French philosopher whose ruminations were well-considered by our founders in the drafting of our own Constitution:

Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression.

Montesquieu, *The Spirit of Laws*, Bk. XI, ch. VI (1748).

Bracton wrote about the power of the executive to pardon in the middle of the thirteenth century. He reasoned of the King's power that:

[T]he king ... may give what is his own, that is his protection, which the outlawed person has lost through his flight and contumacy, but that which is another's he cannot give by his own grace.

Bracton, vol. 2, p. 371 (Twiss trans.) (quoted in Williston, *Does a Pardon Block Out Guilt?*, 28 Harv.L.Rev. 647, 649 (1915)).

Whatever be the effect of a Presidential pardon in other respects, as we shall volunteer below, the notion that the President has the ability, through the pardon power vested under Article II, § 2, to tamper with judicial records is a concept jurisprudentially difficult to swallow. The idea flies in the face of the separation of powers doctrine. We need only to note that Article III, § 1 states: "The judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." It is beyond cavil that the maintenance of court records is an inherent aspect of judicial power. Indeed, all Article III courts of the federal judiciary are deemed "courts of record."

To be sure, Congress can require the judiciary to *maintain* certain records, as it has in criminal records, as an aid to effective law enforcement, 28 U.S.C. § 534, and certain circumstances legislatively mandate expunction: Titles 18 U.S.C. § 3607 and 21 U.S.C. § 844 authorize expunction of records of a defendant convicted of simple possession of a controlled substance, if the defendant was less than 21 years old at the time of the offense. But it would seem

that no proclamation of the executive has the power and authority, under our tradition as well as under constitutional text, to order expunction of court records under the aegis of restoring to the pardoned person "full ... other rights."

Our inquiry could properly stop at this point, but because the *power* of the President to order expunction was not precisely presented by briefs or oral argument and because this is a case of first impression, we will address the substantive question whether restoring "full political, civil and other rights" may entitle the pardoned person to expunction of a criminal record on other grounds. For the reasons that follow, we conclude that no such entitlement exists because the grant of a pardon does not wipe out the record of a conviction.

## V.

We begin by emphasizing again, that when we inquire into the effect of a pardon on a valid conviction record we write on a clean slate. There is no specific precedent supporting or rejecting the notion that after one has been properly convicted of an offense, a subsequent unconditional pardon, as here, entitles the pardoned person to an expunction of his or her criminal record. Nor is there precedent supporting the notion that a balancing test must be employed when the validity of the conviction itself is not challenged.

The collective experience of our judiciary reflected by reported cases, however, discloses that expunction of criminal court records is an extraordinary remedy. Clearly, a federal court has the inherent power to expunge an arrest and conviction record. *See United States v. Friesen*, 853 F.2d 816, 818 (10th Cir.1988) (expunction is within power of the court upon proper showing); *United States v. McMains*, 540 F.2d 387, 389–390 (8th Cir.1976) (in an appeal from district court order directing expunction of all records of a federal conviction for misprision of a felony, court held itself to have inherent power); *Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C.Cir.1974) (judicial remedy of expunction is not dependent on express statutory provision and exists inher-

ently to vindicate substantial rights). However, it is equally well established that granting such relief is confined to extreme circumstances. *Friesen*, 853 F.2d at 817 (expunction proper upon factual showing of harm or extreme circumstances); *Reyes v. Supervisor of Drug Enforcement Admin.*, 834 F.2d 1093, 1098 (1st Cir.1987) (power to expunge is a narrow one); *Allen v. Webster*, 742 F.2d 153, 155 (4th Cir.1984) (acquittee seeking expunction was not entitled to it absent "exceptional circumstances"); *United States v. Schnitzer*, 567 F.2d 536, 539 (2d Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978) (even following dismissal of indictment, expunction not warranted).

Expunction orders have been upheld when an arrest or conviction is constitutionally infirm. *See e.g., Maurer v. Los Angeles County Sheriff's Department*, 691 F.2d 434, 437 (9th Cir.1982) (state prisoner brought civil rights action alleging invalidity of his arrest on federal constitutional grounds); *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C.Cir.), *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973) (case of mass arrest where probable cause was impossible to determine). These orders have been upheld when the record reflects the arrest and conviction of a person based upon a statute subsequently declared unconstitutional, *Kowall v. United States*, 53 F.R.D. 211 (W.D.Mich.1971), or where an unlawful arrest was made for the purpose of harassment or intimidation. *See United States v. McLeod*, 385 F.2d 734, 749–50 (5th Cir.1967) (purpose of arrest was to harass civil rights workers).

But these are all instances in which a court invoked its inherent power to remedy an acquittal, an unconstitutional conviction or an abuse of power. Noonan's conviction does not fit within these perimeters.

■ Moreover, expunction of official records is not automatically granted for convictions overturned on constitutional grounds or even for acquittals. *See United States v. Friesen, supra*, 853 F.2d at 818 (attorney acquitted on all counts of conspiracy to manufacture cocaine was not automatically entitled to expunction of

records); *Livingston v. United States Department of Justice*, 759 F.2d 74, 78 n. 30 (D.C.Cir.1985) (neither dismissal of complaint nor acquittal, without more, justify expunction of arrest record); *Allen v. Webster, supra*, 742 F.2d 153, 154–55; *United States v. Linn*, 513 F.2d 925, 927–28 (10th Cir.), *cert. denied*, 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975) (denial of expunction of acquittee's arrest records where there was no indication that the records would be or had been used improperly); *Rogers v. Slaughter*, 469 F.2d 1084, 1085 (5th Cir. 1972) (public policy requires that retention of arrest record and subsequent proceedings be left to the discretion of judicial authorities).

It bears repetition that in *none* of these recorded cases has expunction been ordered (1) where the circumstances of conviction have not been challenged, or (2) on the basis of a pardon following an unchallenged or otherwise valid conviction.

## VI.

In substantially all of the foregoing cases, the courts employed a balancing test in which the harm to the individual caused by the continued existence of the records is weighed against the governmental interest in maintenance of the records. *Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir.1975); *Diamond v. United States*, 649 F.2d 496, 499 (7th Cir.1981); *Linn, supra, National Treasury Employees Union v. I.R.S.*, 601 F.Supp. 1268, 1273 (D.D.C.1985). In exercising its discretion in this area, a district court is generally afforded a wide range of latitude due to "its greater familiarity with the local scene and the actuality of local public events." *United States v. International Harvester Co.*, 720 F.2d 418, 419 (5th Cir.1983), *cert. denied*, 466 U.S. 939, 104 S.Ct. 1915, 80 L.Ed.2d 463 (1984).

Such a test and standard of appellate review may be warranted and justified where the predicate for the expunction is a challenge to the validity of either the arrest or conviction. These circumstances are not present here because no challenge to the conviction itself is made. In this case, the district court was called upon solely to de-

termine a question of law: whether the 1977 Presidential pardon entitled Gregory Paul Noonan to expunction of his criminal record of conviction. On appeal, this court has the same weighty responsibility—to decide a question of law.

We are requested to construe both the text of the pardon power in Art. II, § 2 and the language of the January 21, 1977 pardon to determine the legal effect of Proclamation 4483. Because this is a matter of law, the standard of review is plenary. *Dent v. Cunningham,* 786 F.2d 173 (3d Cir.1986); *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981). It is to the question of determining the effect of President Carter's pardon that we now turn.

### VII.

The unspoken predicate of Noonan's argument is that a Presidential pardon has the force of wiping out guilt. He relies on dictum set forth in *Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 380, 18 L.Ed. 366 (1866): "A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense." 71 U.S. at 380.

By 1915, however, the Court made clear that it was not accepting the *Garland* dictum that a pardon "blots out of existence the guilt." In *Burdick v. United States,* 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915), the Court reaffirmed its reasoning in *United States v. Wilson,* 32 U.S. (7 Pet.) 150, 8 L.Ed. 640 (1833), and concluded that there is a "confession of guilt implied in the acceptance of a pardon." *Burdick,* 236 U.S. at 91, 35 S.Ct. at 269. The Court explained that "[a pardon] carries an imputation of guilt; acceptance a confession of it." *Id.* at 94, 35 S.Ct. at 270. The idea that a pardon does not vitiate guilt was not merely resurrected by the Court; it had been implied by other courts before *Burdick.* The Supreme Court of New Jersey,

in *Cook v. Freeholders of Middlesex,* 2 Dutch. (N.J.) 326, 331, 333 (1857), wrote:

Pardon implies guilt. If there be no guilt, there is no ground for forgiveness. It is an appeal to executive clemency. It is asked as a matter of favor to the guilty. It is granted not of *right* but of *grace.* A party is acquitted on the ground of innocence; he is pardoned through favor. And upon this very ground is that the pardoning power is never vested in a judge.

More recently, distilling the teachings of *Garland* and *Burdick,* the Court of Appeals for the Seventh Circuit, in a case involving a petitioner convicted of refusing to report for induction, described the effect of a Presidential pardon:

A pardon does not "blot out guilt" nor does it restore the offender to a state of innocence in the eye of the law as was suggested in *Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 380, 18 L.Ed. 366 (1866). *See Burdick v. United States,* 236 U.S. 79, 91, 35 S.Ct. 267, 59 L.Ed 476 (1915) (suggesting that, far from blotting out guilt, the acceptance of a pardon may constitute a confession of guilt). We accept the view of the effect of a pardon propounded by Professor Williston in *Does A Pardon Blot Out Guilt?* 28 Harv.L.Rev. 647, 653 (1915):

The true line of distinction seems to be this: The pardon removes all legal punishment for the offense. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of a crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

Thus, the fact of conviction after a pardon cannot be taken into account in subsequent proceedings. However, the fact of the commission of the crime may be considered. Therefore, although the ef-

fects of the commission of the offense linger after a pardon, the effects of the conviction are all but wiped out.

*Bjerkan v. United States*, 529 F.2d 125, 128 n. 2 (7th Cir.1975). We agree totally with this analysis.

Perhaps the most dramatic example of the inherent confession of guilt in accepting a pardon was the refusal of Jefferson Davis, Ex–President of the Confederacy, to apply for a Presidential pardon after the War between the States. Denied legislative amnesty, he preferred to remain stripped of his citizenship, unable to hold public office or vote, rather than apply to President Andrew Johnson for a pardon, saying:

> It has been said that I should apply to the United States for a pardon, but repentance must precede the right of pardon, and I have not repented. Remembering, as I must, all which has been suffered, all which has been lost, disappointed hopes and crushed aspirations, yet I deliberately say, if it were to do over again, I would again do just as I did in 1861.

H. Strode, *Jefferson Davis: Tragic Hero* 469 (1964).

## VIII.

Our discussion is enriched by an analysis of the effect of a pardon in England prior to the founding of our nation. We draw from England's historical and judicial experience because our own experience on this question has been extremely limited. Indeed, Chief Justice John Marshall noted in *Wilson:*

> The constitution gives to the president, in general terms, "the power to grant reprieves and pardons for offences against the United States." As this power had been exercised, from time immemorial, by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon, and look into their books for

the rules prescribing the manner in which it is to be used by the person who would avail himself of it.

*Wilson v. United States*, 32 U.S. (7 Pet.) 150, 159–60, 8 L.Ed. 640 (1833). The *Burdick* Court, 82 years later, reaffirmed this language, emphasizing that "[t]he principles declared in *Wilson v. United States* have endured for years; no case has reversed or modified them." 236 U.S. at 91, 35 S.Ct. at 269. Precedent for such historical analysis established, we turn to the task at hand.

In examining the English cases we are first struck with the phenomenon that even in modern-day Great Britain, there are few reported contemporary cases on the issue we address here. Thus, in *R. v. Foster, supra*, at 126, the Court of Appeal, Criminal Division, noted "that the effect of a full pardon on the continuing existence of a conviction has not been considered by our courts for very many years."

To the extent that old cases, very old, have been discussed, it seems clear that by 1618 it was agreed that a pardon "affirms the verdict and dis-affirms it not as the purgation doth. So that to take it for both is to imply contradictories." *R. v. Foster, supra*, at 127 (citing *Searle v. Williams* (1618) Hob. 288, 293, 80 ER 433).

In *Foster*, the Court of Appeal, Criminal Division, informed us:

> Many of the extracts we have been shown from textbooks and articles, some of them written centuries ago, tend to support the proposition that a pardon leaves the existence of a conviction untouched. These extracts include the works of *Bracton on the Laws and Customs of England* (1968 ed.) vol. 2, pp. 362–363, 369–370, 372, 378, *Blackstone's Commentaries* (1830) vol. 4, pp. 396–402, *Hawkins' Pleas of the Crown*, 8th ed. (1824) vol. 2, pp. 543, 548, 549 and *Holdsworth, A History of English Law* 2nd ed. (1937) vol. 6, p. 630. We have been referred also to a number of English cases. In *Prohibitions Del Roy* (1607)

12 CoRep 64 James I was firmly, if not severely, advised his powers by the judges of the day. It is stated at p. 64:

> And the Judges informed the King, that no King after the Conquest assumed to himself to give any judgment in any cause whatsoever, which concerned the administration of justice within this realm, but these were solely determined in the Courts of Justice ...

Statements to the like effect appear in many of the works to which we have been referred.

*R. v. Foster, supra,* at 127.

Courts in the British Commonwealth also furnish assistance. *See Re Royal Commission on Thomas Case* [1980] 1 NZLR 602 (New Zealand) (the effect of a pardon was not to create a factual fiction that the crime had not been committed by the person pardoned); *R. v. Cosgrove* [1949] Tas. SR 99 (Tasmania). Chief Justice Morris of the Supreme Court of Tasmania has explained:

> The gist of [the appellant's] contention is that a pardon wipes out the crime ab initio. I have examined the passages in Hawkins' Pleas of the Crown to which he referred and I think they do not go as far as he contends ... The authorities on libel and slander in my opinion do not establish that a pardon wipes out the crime ab initio. They are based on a special policy which the law has seen fit to adopt in relation to defamatory words. Blackstone (vol. 4, p. 402) states the effect of a pardon as follows: "4, Lastly, the effect of such pardon by the King, is to make the offender a new man to acquit him of all corporal penalties and forfeitures annexed to that offence for which he obtains his pardon and not so much to restore his former, as to give him a new, credit and capacity." That passage is entirely consistent with what Hawkins says. Accordingly, a pardon is in no sense equivalent to an acquittal. It contains no notion that the man to whom the pardon is extended never did in fact commit the crime, but merely from the date of the pardon gives him a new credit and capacity.

*R. v. Cosgrove, supra,* at 105.

In accepting the analysis of the early common law as well as modern New Zealand and Tasmanian cases, the Court of Appeal, Criminal Division, in *R. v. Foster, supra,* relied on the language of *R. v. Cosgrove, supra,* and concluded:

> [The effect of the pardon] was to remove the criminal element of the offense named in the pardon, but not to create any factual fiction, or to raise the inference that the person pardoned had not in fact committed the crime for which the pardon was granted.

*R. v. Foster, supra,* at 129; *see also Thomas Case, supra,* 1 NZLR 602.

## IX.

Thus, on the basis of long-held traditional views on the effect of a pardon, covering diverse periods and sources from Bracton and Blackstone to Professor Williston, from seventeenth century English cases to those in contemporary courts of Great Britain and the British Commonwealth, from 1915 teachings of the Supreme Court, and the 1975 analysis of the Court of Appeals of the Seventh Circuit, we conclude that the Presidential pardon of 1977 does not eliminate Noonan's 1968 conviction and does not "create any factual fiction" that Noonan's conviction had not occurred to justify expunction of his criminal court record. *Poena tolli potest, culpa perennis erit* (The punishment can be removed, but the crime remains). BLACK'S LAW DICTIONARY 1040 (5th ed. 1979).

The judgment of the district court will be reversed.