In re Oliver L. NORTH (Clair E. George Fee Application).

Division No. 86–6.

United States Court of Appeals, District of Columbia Circuit.

Oct. 21, 1994.

Before: SENTELLE, Presiding, BUTZNER and SNEED, Senior Circuit Judges.

## ORDER

PER CURIAM.

This matter coming to be heard and being heard before the Special Division of the Court, upon the application of Clair E. George for reimbursement of attorneys' fees pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (1988), and it appearing to the Court for the reasons more fully set forth in the opinion filed contemporaneously herewith, that the motion is not well taken, it is hereby

ORDERED, ADJUDGED and DE-CREED that the petition of Clair E. George for attorneys' fees he incurred during the investigation by Independent Counsel Lawrence E. Walsh be denied in its entirety this 21st day of October, 1994.

Separate dissenting opinion filed by Senior Circuit Judge SNEED.

PER CURIAM.

Pursuant to section 593(f)(1) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599, Clair E. George, former CIA Deputy Director for Operations, requests reimbursement for $1,297,950.18 in attorneys' fees incurred as a result of the Iran/Contra investigation conducted by Independent Counsel Lawrence E. Walsh. The Act authorizes this court to award the "subject" of an independent counsel investigation certain attorneys' fees incurred during that investigation, but only if no indictment is brought against that person. 28 U.S.C. § 593(f)(1). Although George was indicted, he claims that a pardon he received from President Bush entitles him to attorneys' fees. We conclude that the pardon does not authorize the court to waive the restrictions set forth in § 593(f)(1). Nor does the pardon remove from George the disability caused by the indictment. Consequently, we deny his petition for the allowance of fees.

## I

On December 19, 1986, this court appointed Independent Counsel Walsh "to investigate ... alleged violations of federal criminal laws ... in connection with the sale or shipment of military arms to Iran and the transfer or diversion of funds realized in connection with such sale or shipment." *In re North (Shultz Fee Application)*, 8 F.3d 847, 849 (D.C.Cir.1993) (*per curiam*).

George served as Deputy Director of Operations of the CIA during the time that the events constituting the substantive basis of the Iran/Contra matter took place. By virtue of his position, George testified before Congress on approximately seven occasions from October 1986 through December 1987. In early 1991, George voluntarily appeared for an interview in the Office of Independent Counsel. On April 5, 1991, George appeared before a grand jury.

On July 8, the Independent Counsel notified George that he was a target for criminal prosecution. Shortly thereafter, George retained counsel. On September 6, 1991, George was indicted on ten counts of false statements, perjury, and obstruction of justice. One count was dismissed before trial.

George's first trial ended in a mistrial. The independent counsel dismissed two additional counts, and George was retried on the remaining seven. The jury found George guilty on two counts—one of making a false statement and one of perjury—and acquitted George on the remaining counts.

On December 24, 1992, after the jury verdict but before judgment of conviction was entered, George received a "full, complete, and unconditional pardon" from President George Bush. This fee petition followed.

## II

We start with the Constitution's command: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law...." U.S. Const. art. 1 § 9 cl.7. This provision is a restriction on the power of the President to grant pardons. *Knote v. United States*, 95 U.S. (5 Otto) 149, 154, 24 L.Ed. 442 (1877). To comply with this constitutional provision and yet permit a qualified individual who has been investigated pursuant to the Ethics in Government Act to obtain counsel fees payable from the United States Treasury, Congress enacted 28 U.S.C. § 593(f)(1). This section authorizes this court to award to a subject of the independent counsel's investigation "if no indictment is brought against this individual" reasonable attorneys' fees incurred during the investigation which would not have been incurred but for the requirements of the Act. Had no pardon occurred, George would not be entitled to reimbursement for attorneys' fees. The issue before us is, therefore, whether the Presidential pardon of George authorizes this court to award him attorneys' fees.

The litigant in *Knote* was a pardoned Confederate supporter who had lost his property through confiscation. He contended that the pardon not only wiped out the criminal consequences of his acts but also entitled him to restoration of his confiscated estate. The Supreme Court rejected his claim. The principles explained in *Knote* apply so clearly to George's application for an award of attorney fees that they bear quotation at length:

A pardon is an act of grace by which an offender is released from the consequences of his offence, so far as such release is practicable and within control of the pardoning power, or of officers under its direction. It releases the offender from all disabilities imposed by the offence, and restores to him all of his civil rights. In contemplation of law, it so far blots out the offence, that afterwards it cannot be imputed to him to prevent the assertion of his legal rights. It gives to him a new credit and capacity, and rehabilitates him to that extent in his former position. But it does not make amends for the past. It affords no relief for what has been suffered by the offender in his person by imprisonment, forced labor, or otherwise; it does not give compensation for what has been done or suffered, nor does it impose upon the government any obligation to give it. The offence being established by judicial proceedings, that which has been done or suffered while they were in force is presumed to have been rightfully done and

justly suffered, and no satisfaction for it can be required.

95 U.S. (5 Otto) at 153–54.

The Court noted that funds from the confiscated property had been deposited in the Treasury. The opinion continues:

> Moneys once in the treasury can only be withdrawn by an appropriation by law. However large, therefore, may be the power of pardon possessed by the President, and however extended may be its application, there is this limit to it, as there is to all his powers,—it cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress. The Constitution places this restriction upon the pardoning power.

95 U.S. (5 Otto) at 154.

*Knote* must be read along with *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), in which the Court held that legislation diminishing the scope of the President's pardoning power was unconstitutional. The Court relied on the doctrine of the separation of powers, saying: "Now it is clear that the legislature cannot change the effect of such a pardon any more than the executive can change a law." 80 U.S. (13 Wall) at 148.

George asks this court to do precisely what the Constitution, *Knote,* and *Klein* forbid. He seeks to have the court authorize payment from the Treasury despite the lack of congressional authorization. To broadly interpret the statute to allow an award of attorney fees despite its text runs counter to the concept of sovereign immunity. The right to recover attorneys' fees from the United States depends on whether Congress has waived sovereign immunity. We have previously held that we must strictly construe the waiver found in § 593(f)(1). *See In re Donovan,* 877 F.2d 982, 994 (D.C.Cir. 1989). In determining fee awards, "care must be taken not to enlarge [a statute's] waiver of immunity beyond what a fair reading of the language of the section requires." *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 686, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983) (internal quotation omitted). The language of § 593(f)(1) waives sovereign immunity for attorneys' fees only if no indictment has been brought. We cannot expand this waiver to allow an award to a person who has been indicted.

## III

It seems quite apparent that this court cannot pay money from the Treasury without an act of Congress authorizing the payment. Nor may the President change § 593(f)(1) by exercising his power to pardon. The question then arises: Can the pardon annul, expunge, or otherwise nullify George's indictment so he can receive the fees pursuant to the statute? The answer is no; the pardon does not remove his disability.

*Knote* addresses this question. The pardon "does not make amends for the past." 95 U.S. (5 Otto) at 153. It gives no compensation for what has been suffered. "The offence being established by judicial proceedings, that which has been done or suffered while they were in force is presumed to have been rightfully done and justly suffered, and no satisfaction for it can be required." 95 U.S. (5 Otto) at 154.

George relies in large part on an earlier case, *Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866), in which the Court said:

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

71 U.S. (4 Wall) at 380–81. Four Justices dissented from the majority's views on the scope of the pardon. 71 U.S. (4 Wall) at 396.

Garland was a lawyer who had served as an official in the Confederacy. At the end of the war, the President pardoned him, but an

Act of Congress excluded him from practicing before the Supreme Court. Nevertheless, the Court admitted him. It did not rest its judgment on the theory that the pardon blotted out Garland's guilt. This expansive view of the effect of a pardon turned out to be dictum. The Court held that Garland's exclusion was punishment, which the pardon barred. 71 U.S. (4 Wall) at 381.

Chief Justice Marshall defined a Presidential pardon as follows: "A pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed." *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160, 8 L.Ed. 640 (1833). *Garland's* rationale is consistent with *Wilson*; its dictum about blotting out guilt is inconsistent with *Wilson*.

*Garland's* dictum was implicitly rejected in *Burdick v. United States*, 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915), which recognized that the acceptance of a pardon implies a confession of guilt. 236 U.S. at 91, 94, 35 S.Ct. at 269, 271. Citing *Burdick*, the Seventh Circuit observed: "A pardon does not 'blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law as was suggested in *Ex Parte Garland*." *Bjerkan v. United States*, 529 F.2d 125, 128 n. 2 (7th Cir.1975); *accord State v. Skinner*, Del.Supr., 632 A.2d 82, 85 (1993) (citing state cases).

Another recent decision on the effect of a presidential pardon rejects *Garland's* dictum. The recipient of a presidential pardon sought expunction of court records relating to his conviction. The district court granted his motion, relying on *Garland's* theory that a pardon "blots out of existence the guilt." 71 U.S. (4 Wall) at 380. The government appealed, and the court of appeals reversed. In *United States v. Noonan*, 906 F.2d 952 (3d Cir.1990), Judge Aldisert canvassed American and English precedent, courts in the British Commonwealth, and scholarly commentary. Judge Aldisert concluded:

Thus, on the basis of long-held traditional views on the effect of a pardon, covering diverse periods and sources from Bracton and Blackstone to Professor Williston, from seventeenth century English cases to those in contemporary courts of Great Britain and the British Commonwealth, from 1915 teachings of the Supreme Court, and the 1975 analysis of the Court of Appeals of the Seventh Circuit, we conclude that the Presidential pardon of 1977 does not eliminate Noonan's 1968 conviction and does not "create any factual fiction" that Noonan's conviction had not occurred to justify expunction of his criminal court record.

906 F.2d at 960. *United States v. Noonan* is pertinent because the recipient of the presidential pardon in that case unsuccessfully requested a court order that he "may, as well as all others must, consider the criminal indictment expunged as if it had never occurred." 906 F.2d at 954. George seeks no less.

To reiterate, § 593(f)(1) provides that the court may award attorneys' fees to a subject of the independent counsel's investigation if no indictment is brought against him. An indictment establishes probable cause that the accused has committed a crime. Guilt can be established only by a much higher standard, proof beyond a reasonable doubt. Because a pardon does not blot out guilt or expunge a judgment of conviction, one can conclude that a pardon does not blot out probable cause of guilt or expunge an indictment. George's disability remains.

IV

*United States v. Padelford*, 76 U.S. (9 Wall.) 531, 19 L.Ed. 788 (1869), also does not support George's application for attorneys' fees. Padelford sued in the Court of Claims under the Act of March 12, 1863, to claim the proceeds of his cotton, which federal troops seized in Savannah, Georgia, and sold. The proceeds had been deposited in the United States Treasury. The Act required Padelford to prove ownership of the cotton and that he had never given any aid or comfort to the Confederacy. Padelford, however, had given assistance to officers of the Confederate Army. Another Act of Congress authorized the President to pardon persons who had participated in the Confederacy upon

such conditions as he determined. The President extended a pardon to all persons who took a certain oath and abided by it. The Court stated that by virtue of the pardon, Padelford "was purged of whatever offence against the laws of the United States he had committed . . . and relieved from any penalty which he might have incurred." Most importantly from Padelford's perspective, the pardon expressly granted "restoration of all rights of property, except as to slaves and [intervening rights of third parties]." 76 U.S. (9 Wall) at 533, 542.

Padelford proved that he took the oath, which the pardon required, before his cotton was seized. The Court held that because Padelford took the oath before the troops seized his property, his right to the property "at the time of the seizure, was perfect, and . . . it remains perfect, notwithstanding the seizure." 76 U.S. (9 Wall) at 543. The Court concluded:

> Under the proclamation [the pardon] and the act, the government is a trustee, holding the proceeds of the petitioner's property for his benefit; and having been fully reimbursed for all expenses incurred in that character, loses nothing by the judgment, which simply awards to the petitioner what is his own.

76 U.S. (9 Wall) at 543.

Two years later, in *United States v. Klein,* the Court, whose personnel had not changed, described its ruling in *Padelford* by emphasizing the importance of the congressional enactment:

> In the case of Padelford we held that the right to the possession of private property was not changed until actual seizure by proper military authority, and that actual seizure by such authority did not divest the title under the provisions of the Abandoned and Captured Property Act. The reasons assigned seem fully to warrant the conclusion. The government constituted itself the trustee for those who were by that act declared entitled to the proceeds of captured and abandoned property, and for those whom it should thereafter recognize as entitled.

80 U.S. (13 Wall) at 138–39.

The distinction between Padelford's and George's applications for fees is quite obvious. Padelford qualified under the terms of a statute and a pardon that promised restoration of his property if he took a prescribed oath. In contrast, neither § 593(f)(1) nor George's pardon provides for the payment of attorneys' fees to a person who has been indicted. The government held the proceeds of the sale of Padelford's property in trust for him. As the Court pointed out, the government lost nothing, for it simply awarded to Padelford "what is his own." 76 U.S. (9 Wall) at 543. In contrast, the government holds nothing belonging to George in trust for him. Rather, George asks for funds from the Treasury.

## V

In sum, the constitutional requirement that funds from the Treasury may be disbursed only by authorization of Congress is a restriction on the President's power to pardon. George, having been indicted, is not entitled to an award of attorneys' fees under the provisions of § 593(f)(1). We cannot waive these provisions, and the pardon cannot change them. The pardon does not blot out guilt or expunge the indictment. Though pardoned, George's disability—the fact of his indictment—remains, preventing the court from awarding him attorneys' fees.

George's fee petition is denied. Judgment accordingly.

SNEED, Senior Circuit Judge, dissenting:

The majority admirably sets forth the reasons for deciding this matter against George. Admittedly, the issue is a close one. However, I approach it from a different perspective and would reach a different result.

At its heart, the issue is whether the statutory requirement of "no indictment" should be considered as an unalterable part of the statute or as a disability subject to removal as a consequence of a Presidential pardon.

A straightforward analysis will support the former view. The majority has provided it. George was indicted. The statute provides no fees for those indicted. A pardon cannot

change the law. It cannot appropriate money. Thus, George cannot recover fees.

Straight as it may seem, I cannot follow the majority's path. I view the statute as an authorization by Congress to pay the legal fees of those who are "subject[s]" of an independent counsel's investigation, conditioned on there being no indictment of the "subject." 28 U.S.C. § 593(f)(1). Under the Act, therefore, an indictment imposes a legal disability barring suit by those indicted. A Presidential pardon removes the disabilities attendant upon indictment or conviction of an offense. I would hold, therefore, that George's receipt of a pardon eclipses his indictment and removes, with respect to a portion of the fees, the attendant disability.

## I.

Article II, section 2 of the Constitution gives the President "Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." U.S. Const., art. II, § 2, cl. 1. In *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380, 18 L.Ed. 366 (1866), the Supreme Court observed that "[i]f granted before conviction, [a pardon] prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores [the person pardoned] to all his civil rights." These rights include the right to testify in court, *see Boyd v. United States*, 142 U.S. 450, 453–54, 12 S.Ct. 292, 293–94, 35 L.Ed. 1077 (1892), and the right to vote, *see* Samuel Williston, *Does a Pardon Blot Out Guilt?*, 28 Harv.L.Rev. 647, 654 & n. 25 (1915) (collecting cases).

The issue here is whether a full pardon restores George's right to sue under the Act by removing the "no indictment" bar. Like the majority, I rely on a "Reconstruction" case—albeit a different one, *United States v. Padelford*, 76 U.S. (9 Wall.) 531, 19 L.Ed. 788 (1869). *Padelford* arose under the Captured and Abandoned Property Act, which provided that property captured or found abandoned during the Civil War would be sold, with the proceeds set aside by the Treasury. *Id.* at 538. The original property owner could recoup the sale proceeds upon proof

that "he never gave any aid or comfort to the rebellion." *Id.* The claimant in *Padelford* sought reimbursement for cotton he had stored in Savannah at the time that city was captured by Union forces. *Id.* at 539.

The Court found that Padelford had indeed aided the rebellion, by acting as a surety for certain Confederate military personnel. *Id.* The Court also found, however, that Padelford had subsequently accepted a Presidential offer of amnesty. *Id.* at 539, 542. Citing *Garland*, the Court held that Padelford "was purged of whatever offence against the laws of the United States he had committed by [aiding the Confederacy], and relieved from any penalty which he might have incurred." *Id.* at 543. Alternatively, as a matter of statutory construction, the Court found that the law implicitly made "the proof of pardon a complete substitute for proof that [a claimant] gave no aid or comfort to the rebellion." *Id.* In any event, the Court found that Padelford was entitled to reimbursement despite the statutory bar. *See id.*

Here, as in *Padelford*, Congress has established a scheme for reimbursing certain parties to a conflict. With the passage of over a century, the battlefield and combatants are undeniably different, but the underlying statutory themes of reparation and remedy are similar. Here, Congress has also established a *legal disability* which bars suit by "subjects" indicted of a federal offense. Its function is similar to the legal bar that faced Confederate sympathizers in *Padelford*.

As the *Padelford* Court held, a pardon wipes clean such legal impediments. Thus, I would hold that the pardon received by George removes the indictment bar to fee recovery under the Act. It should restore his right to sue under the Act. To do less improperly diminishes the Presidential power to pardon. The right to sue is at least as fundamental as the right to testify in court, and we have afforded the latter right to pardoned criminals for over a century. *See Boyd v. United States*, 142 U.S. at 453–54, 12 S.Ct. at 293–94 (pardon restores convicted criminal's right to testify); *see also Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 43–44, 18 L.Ed. 745 (1868) (including "free access to

... the courts of justice in the several States" among the privileges and immunities of citizenship).

The power of the President to pardon, moreover, is quite broad. "[T]he pardoning power is an enumerated power of the Constitution and ... its limitations, if any, must be found in the Constitution itself." *Schick v. Reed,* 419 U.S. 256, 267, 95 S.Ct. 379, 385, 42 L.Ed.2d 430 (1974); *see also United States v. Klein,* 80 U.S. (13 Wall.) 128, 148, 20 L.Ed. 519 (1871) ("[T]he legislature cannot change the effect of ... a pardon any more than the executive can change a law."). The Act with which we are concerned makes no attempt to limit Presidential pardons. Given the serious constitutional issues such a limitation would present, I would not construe the Act so as to infer one. *See Carlisle v. United States,* 83 U.S. (16 Wall.) 147, 153, 21 L.Ed. 426 (1872) (interpreting Captured and Abandoned Property Act to allow recovery by aliens who had been pardoned for aiding the Confederacy): "It is not to be supposed that Congress intended by the general language of the act to encroach upon any of the prerogatives of the President, and especially that benign prerogative of mercy which lies in the pardoning power."

## II.

The majority relies on *Knote v. United States,* 95 U.S. (5 Otto) 149, 153–54, 24 L.Ed. 442 (1877). As the majority points out, there the Supreme Court refused to return property, previously forfeited to the United States upon the original owner's treason, after that party's receipt of a pardon. *Id.* Here, unlike *Knote,* no formal court judgment has divested George of his "title" to the fee award. No property of George became vested in the Treasury of the United States. *Cf. Knote,* 95 U.S. (5 Otto) at 149. He has merely incurred a debt to his attorneys for which, as in *Padelford,* the government has established a scheme of reparation. No such scheme applied in *Knote.* There the claimant sought to recover on an implied contract basis. *See Knote,* 95 U.S. (5 Otto) at 157. For these reasons, I would find *Padelford* to be the controlling authority.

The majority also relies on the constitutional principle that a pardon cannot reach monies in the United States Treasury without a congressional appropriation. The short answer is that the Act constitutes just such an appropriation. That again brings us to *Padelford,* which expressly rejected the majority's argument:

[I]t has been suggested that [Padelford's] property was captured in fact if not lawfully; and that the proceeds having been paid into the Treasury ..., the petitioner is without remedy ... unless proof is made he gave no aid or comfort to the rebellion. The suggestion is ingenious, but we do not think it sound. The sufficient answer to it is that after the pardon no offense connected with the rebellion can be imputed to him.... [T]he law makes the proof of pardon a complete substitute for proof he gave no aid or comfort to the rebellion.

*Padelford,* 76 U.S. (9 Wall) at 543.

The majority also observes that waivers of sovereign immunity, like the Act, are to be strictly construed in favor of the sovereign. It does not follow, however, that a waiver of sovereign immunity can be construed to limit the effect of a Presidential pardon. The Supreme Court, in a case following *Padelford,* expressly rejected a sovereign immunity defense. *United States v. Klein,* 80 U.S. (13 Wall.) 128, 144, 20 L.Ed. 519 (1871): "It was urged in argument that the right to sue the government ... is a matter of favor; but this seems not entirely accurate. It is as much the duty of the government as of individuals to fulfil its obligations."

## III.

In light of its holding, the majority does not address the remaining requirements of the Act. I shall briefly discuss one. The Act authorizes this court to award reimbursement only for reasonable attorneys' fees incurred *during* the related independent counsel *investigation.* 28 U.S.C. § 593(f)(1). For any given applicant, the investigation terminates with the return of an indictment with respect to that applicant. *In re Nofziger (Mark A. Bragg),* 956 F.2d 287, 289 (D.C.Cir.1992) (per curiam). We therefore lack jurisdiction to award reimbursement for

fees incurred in the post-indictment phase, such as pre-trial and trial fees. *Id.* (denying petition for post-indictment fees, even though the related indictment was invalid).

I would hold that George, despite his pardon, is not entitled to post-indictment attorneys' fees. The President's power to pardon, as broad as it is, can change no law enacted by Congress. While it removes the legal bar to his suit, it neither alters the historical chronology of the investigation nor otherwise changes the language or scope of the Act. While it unlocks the statutory box, it does not alter the contents. This, then, is the true operative force of *Knote.*

This would preclude recovery of the lion's share of the amount sought by George's petition. Based on his supporting documentation, George incurred only $35,974.05 in fees and expenses prior to his indictment.[1] I would therefore hold that we lack statutory authority to award the remaining $1,261,976.13. Thus, although George's pardon enables him to surmount the "no indictment" requirement, that fact represents only a limited victory.

### IV.

Finally, I should address the policy issues to the extent they are severable from the legal ones. Would my approach impose a substantial burden on the Treasury? I think not; Presidential pardons under the Ethics in Government Act will be infrequent, I believe. Moreover, the relief afforded, while helpful, would be small. Lastly, there appears to me to be no reasonable ground to object to the limited reach of the pardon power my logic embraces. I am reasonably sure, but not certain, of course, that George served his country honorably, as that term must be understood when evaluating intelligence agents. The then-President obviously thought so. Intelligence work demands

strong loyalty to the Nation, as well as discreet silence and sometimes greatly diminished candor. Agents sometimes cross the line into the field of partial truth and falsehood, even before Congress. We cannot condone such crossings, but when the President extends his mercy, neither should we deny the petitioner our bit of compassion.

### V.

The majority views the "no indictment" requirement as an integral part *of* the Act, and thus does not allow George any recovery. I view the same requirement as a legal disability attached *to* the Act, and would allow George some recovery—albeit one limited by the Act's "during the investigation" element. The parallax caused by our different points of view is not great, but it is enough to prevent my joining in the majority's opinion or its result. Therefore, I respectfully dissent.

---

1. I calculate this amount as follows: With regards to legal fees, George's supporting documentation describes September 6, 1991, as the "indictment day." I consider all fees incurred prior to that date to be pre-indictment fees. George's petition does not allocate fees incurred on the day of his indictment between pre- and post-indictment fees. In the interest of simplicity, I allocate one-half of that day's fees to each.

With regard to out-of-pocket expenses, George's petition lists aggregate expenses by month without prorating by day. I consider all expenses for the months of July and August 1991 to be pre-indictment expenses. As for expenses incurred during September 1991, the month of indictment, I prorate these expenses evenly throughout the month.