936 So.2d 1279 (2006)
Max T. MALONE, et al., Plaintiff-Appellee
v.
Joe SHYNE, Defendant-Appellant.
No. 41,781-CA.
Court of Appeal of Louisiana, Second Circuit.
August 29, 2006.
Writ Denied September 5, 2006.
*1281 Davis Law Office, LLC, by S.P. Davis, Sr., for Appellant.
Wiener, Weiss & Madison, by M. Allyn Stroud, Shreveport, The Pesnell Law Firm, by Billy R. Pesnell, J. Whitney Pesnell, W. Alan Pesnell, Shreveport, for Appellees, Max T. Malone and James Edward Green.
Bennett L. Politz, Shreveport, for Appellee, Gary Loftin, in His Official Capacity as Clerk of Court in and for Caddo Parish, LA.
Before BROWN, WILLIAMS, STEWART, GASKINS, CARAWAY, PEATROSS, DREW, MOORE, and LOLLEY, JJ.
CARAWAY, J.
In 2003, Louisiana Governor Murphy J. Foster granted Joe Shyne a pardon following this court's ruling in 2002 disqualifying Mr. Shyne as a candidate for public office pursuant to a 1998 amendment to Louisiana's Constitution.[1] Mr. Shyne had received a prior federal conviction of a felony. Governor Foster's pardon expressly granted Mr. Shyne "a full pardon with restoration of all civil and citizenship rights." Mr. Shyne has now attempted to qualify as a candidate for the Shreveport City Council, and plaintiff[2] brings this action challenging his candidacy pursuant to La. Const. art. I, § 10(B)(1) which disqualifies convicted felons from holding public office. Nevertheless, the trial court's ruling determined that the gubernatorial pardon power may not restore the right to hold office denied by Louisiana law. We now determine that the Governor of Louisiana did not exceed his authority by pardoning Mr. Shyne from the constitutionally enacted disqualification for public office. When the 1998 amendment placed that disqualification upon a Louisiana citizen, it simultaneously gave the governor a pardon power for its removal. Federal law allows Louisiana to impose this disqualification on a federally convicted felon and to also remove the disqualification by exercise of a gubernatorial pardon. Accordingly, we reverse the trial court's decision.

Facts
On January 21, 1994, Joe Shyne entered a guilty plea to the crime of extortion by a *1282 public official in violation of 18 U.S.C. § 1951. A judgment of conviction was entered in the United States District Court, Western District of Louisiana on April 7, 1994, sentencing Mr. Shyne to twelve months and one day imprisonment and ordering him to surrender for service of sentence on May 2, 1994. Upon his release from prison, Mr. Shyne was placed on supervised release for a period of three years. The record contains evidence showing that Mr. Shyne was released from prison on March 15, 1995, and would have apparently then begun his three-year probationary term.
On August 29, 2003, Louisiana Governor Murphy J. Foster issued a "Grant of Clemency to Joe Shyne" upon recommendation of the Louisiana Board of Pardons. The Governor granted Mr. Shyne a "full pardon with restoration of all civil and citizenship rights, except for the right to own, possess, receive, ship, and transfer firearms to Joe Shyne and do hereby direct you to act accordingly, and for so doing this shall be your sufficient warrant and authority."
On August 9, 2006, Mr. Shyne filed a notice of candidacy for the seat of Shreveport City Councilman, District F, in the September 2006 primary election. On August 18, 2006, James Edward Green, a candidate for the District F Councilman seat, filed a timely petition seeking to have Mr. Shyne disqualified as a candidate for office. The plaintiff contended that Mr. Shyne was disqualified as a candidate pursuant to La. Const. art. I, § 10(B)(1) because (1) he was convicted of a felony under the laws of the United States, (2) had never been pardoned by the President of the United States, and (3) fifteen years had not elapsed since the completion of his original sentence.
By answer to the suit, Mr. Shyne conceded that he was convicted of a federal felony and that fifteen years had not elapsed since the completion of his original sentence. He nevertheless argued that he was qualified to hold public office under La. Const. art. I, § 10(B)(1) because of the Governor's pardon.
On August 23, 2006, the trial court rendered judgment in favor of Green, concluding that La. Const. art. I, § 10(B)(1) required a presidential pardon for Mr. Shyne's federal felony in order for him to qualify to hold public office. This timely appeal followed.

Louisiana Constitutional Law
Three Louisiana Constitutional articles form the focus for resolving the issues before us. Those articles are La. Const. art. I, § 20 (hereinafter referred to as "Art. I, § 20"), La. Const. art. IV, § 5(E)(1) (hereinafter referred to as "Art. IV, § 5(E)(1)"), La. Const. art. I, § 10(B) (hereinafter referred to as "Art. I, § 10(B)" or the "1998 Amendment").
The pertinent provision of Art. I, § 20, which was included in the Louisiana Constitution of 1974, states:
Full rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense.
The provisions of Art. I, § 10(B), which were added by amendment to the constitution in 1998, state:
The following persons shall not be permitted to qualify as a candidate for elective public office or take public elective office or appointment of honor, trust, or profit in this state:
(1) A person who has been convicted within this state of a felony and who has exhausted all legal remedies, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, *1283 would be a felony and who has exhausted all legal remedies and has not afterwards been pardoned either by the governor of this state or by the officer of the state, nation, government or country having such authority to pardon in the place where the person was convicted and sentenced.
(2) A person actually under an order of imprisonment for conviction of a felony.
Article I, Section 10, Subsection C also added by the 1998 Amendment allows the convicted felon to seek public office "fifteen years after the date of the completion of his original sentence."
The pertinent provisions of Art. IV, § 5(E)(1), also originally enacted in 1974, state:
The governor may grant reprieves to persons convicted of offenses against the state and, upon favorable recommendation of the Board of Pardons, may commute sentences, pardon those convicted of offenses against the state, and remit fines and forfeitures imposed for such offenses.
Also, the provisions of La. R.S. 15:529.1(H) state that a "person shall not be qualified to be a candidate for elected public office or take elected office if that person has been convicted of a felony, whether convicted within this state or convicted under the laws of any other state or of the United States, of a crime which, if committed in this state would be a felony, and has not received a pardon therefor."
The starting point in the interpretation of constitutional provisions is the language of the Constitution itself. Ocean Energy, Inc. v. Plaquemines Parish Gov't, 04-66 (La.7/6/04), 880 So.2d 1. When a constitutional provision is plain and unambiguous and its application does not lead to absurd consequences, its language must be given effect. Id. Unequivocal constitutional provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. Cajun Elec. Power Co-op. v. Louisiana Pub. Serv. Comm'n, 544 So.2d 362 (La.1989). When the constitutional language is subject to more than one reasonable interpretation, it is necessary to determine the intent of the provision. Ocean Energy, Inc. v. Plaquemines Parish Gov't, supra. In seeking to ascertain constitutional intent, the same general rules used in interpreting laws and written instruments are followed. East Baton Rouge Parish School Bd. v. Foster, 02-2799 (La.6/6/03), 851 So.2d 985. In construing a constitutional provision, the courts may consider the object sought to be accomplished by its adoption, and the evils sought to be prevented or remedied, in light of the history of the times and the conditions and circumstances under which the provision was framed. Succession of Lauga, 624 So.2d 1156 (La.1993). Additionally, if one constitutional provision addresses the subject in general terms, and another addresses the same subject with more detail, the two provisions should be harmonized if possible, but if there is any conflict, the latter will prevail. Ocean Energy, Inc. v. Plaquemines Parish Gov't, supra; Perschall v. State, 96-322 (La.7/1/97), 697 So.2d 240. However, where the language of a constitutional prohibition makes its aim evident and unequivocal, courts need not consider the historical basis for the prohibition and may not, by separately considering related constitutional provisions, arrive at a construction that detracts from the effectiveness or manifest meaning or purpose of the related provisions. Id.

Discussion
The 1998 Amendment to our Constitution, which added Art. I, § 10(B)(1), disqualifies from holding elective office a person *1284 convicted as a felon, resulting from prosecution either in the state or federal systems. It then provides that this disqualification ends if the party has "been pardoned either by the governor of this state or by" the president of the United States. A literal reading of this pardon provision does not require that only the president may pardon a federal felon and free him from Louisiana's constraint. Likewise, the provision indicates that the governor may pardon a person convicted in the federal system of a crime which would amount to a felony in Louisiana. Our research finds that the federal law allows a gubernatorial pardon of a federal felon to lift a state imposed constraint on the party. Thus, the question presented is solely a matter of our state's constitutional grant of the power to the governor and whether it allows the governor to remove the Louisiana disqualification from a person convicted of a federal crime.
The trial court's ruling effectively conceded that the literal wording of the 1998 Amendment allows the governor's pardon to end Mr. Shyne's disqualification from seeking office. Yet, the trial court looked beyond the 1998 Amendment to the general enumeration of the executive's pardon power in Art. IV, § 5(E)(1), finding that it defined "pardon" in a limited manner which would bar a Louisiana governor's pardon from restoring Louisiana civil rights to any person convicted of a crime against the United States. The phrase "offenses against the state," used for the enumeration of the pardon power in Art. IV, § 5(E)(1) was the focus of the trial court's ruling. Mr. Shyne's disability for holding public office was viewed as resulting from an offense against the United States. Nevertheless, consideration of the federal consequences of Mr. Shyne's offense, the jurisprudence, and the history of the general pardon power in our state and nation suggests that the extent of Louisiana's pardon power specifically authorized by the 1998 Amendment does not hinge on the language relied on by the trial court.
To aid in an analysis of the pardon power, the consequences of a felony offense under both federal and state law should be broken down between the direct criminal punishment for the crime and the collateral civil disabilities imposed for the resulting status of the felon. Only the federal law in this case could punish Mr. Shyne for his conviction with incarceration, fines and related penalties, and no gubernatorial pardon power could change that punishment. In addition to the criminal punishment which Mr. Shyne received, federal regulatory requirements may prevent him from obtaining certain licenses and privileges resulting in collateral federal disabilities for his status as a convicted felon. See, e.g., Hirschberg v. Commodity Futures Trading Comm'n, 414 F.3d 679 (7th Cir. 2005) and Thrall v. Wolfe, 503 F.2d 313 (7th Cir.1974), cert. denied, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975) (involving a pardoned state felon's failed attempt to obtain a federal firearms license).
The collateral consequence of Mr. Shyne's offense against the United States in this case, however, is a citizenship disability which has nothing to do with a federal statute or regulation. Citizenship rights regarding local elective offices are within the purview of the states. Mr. Shyne's disability for holding Louisiana elective office does not result from an offense "against the United States," in the sense that it reflects on a federal policy or interest to restrict his citizenship. Even though Louisiana could not exact corporal punishment for Mr. Shyne's federal conviction, it is allowed to place him under a citizenship disability to promote the policy of good government for Louisiana. As *1285 addressed in this court's prior ruling involving the 1998 Amendment, the disqualification placed upon Mr. Shyne by the State of Louisiana is not punishment as an ex post facto law because the restriction arose to regulate a present situation in furtherance of state policy. Malone v. Tubbs, supra. Only upon the exercise of a presidential pardon may a state's denial of rights to federal felons be questioned based upon the Supremacy Clause. Bjerkan v. United States, 529 F.2d 125 (7th Cir.1975). Nevertheless, even a presidential pardon may not remove all collateral consequences for a federal felony conviction which a state might elect to impose. Carlesi v. New York, 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914) (state can take into consideration a prior offense committed against the United States after a presidential pardon, as long as the state's action does not constitute punishment.)
In an election contest involving a candidate with a prior federal conviction, the Louisiana Supreme Court, in dicta, recognized this distinction between the state's policy interest for setting qualifications for voters or candidates with federal convictions and the federal government's interest for directly punishing their offenses against the United States. Crothers v. Jones, 239 La. 800, 120 So.2d 248 (1960). The court made the following observation, citing an Alabama ruling:
Our research has revealed no authority which would have made it incumbent upon Jones to secure a pardon from the President of the United States before registering in Louisiana. He had served his sentence and had paid the fine assessed against him. "True only the President could grant a pardon for remission of the fine and release from imprisonment. But no official of the Federal government would have interest in the matter of restoration of civil rights tending to the qualifications of the convicted person for an office under State authority."
Id. at 120 So.2d 254.
In summary, a state's denial of the right to hold office does not effect criminal punishment for an offense against the United States, nor is it a collateral consequence limiting citizenship rights in the interest of federal policy. In no sense is Mr. Shyne's disability a federal response for an offense against the United States. Instead, Art. I, § 10(B) disqualifies felons from elective office because their prior criminal conduct is offensive to Louisiana's notion of the public trust which is invested in elected officials. Federal law does not prevent Louisiana from placing such disabilities on a federal felon, nor removing them by the exercise of a gubernatorial pardon.[3] The temporary 15-year withdrawal of Mr. Shyne's citizenship right in *1286 this case is therefore solely a product of Louisiana. Nevertheless, the trial court's ruling holds that the Louisiana executive pardon power may not restore that right. While making that determination, the trial court's scholarly reasoned opinion properly recognized the lack of a federal interest in this case, stating: "[I]t makes little sense to cede decisions as to the rights Louisiana will afford to Louisiana citizens to the executive branch of the federal government or another state, or even worse, to a potentate of a foreign nation."
Examination of the pardon power in Louisiana jurisprudence has drawn from an understanding of the pardon power of our federal constitution and common law. According to our Supreme Court, the scope of Louisiana's pardon power may be gauged by "analysis of the nature and extent of the pardon power of the monarchs of England (the source of the executive pardon power in this country), the proceedings of our federal constitution, the Federalist and other constitutional papers, and the early constitutions of the states of this country, including our own Constitution of 1812." State v. United Bonding Ins. Co. of Indianapolis, Ind., 244 La. 716, 722, 154 So.2d 374 (1963), see also citations to authorities therein; State v. Lee, 171 La. 744, 132 So. 219 (1931); Schick v. Reed, 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974). The power to pardon is an executive prerogative of mercy. United States v. Noonan, 906 F.2d 952 (3d Cir.1990).
In Louisiana's previous constitutions, the language "of offenses against the state" was only used in conjunction with the enumeration of the governor's power to grant reprieves. The governor was otherwise given the power generally to "grant pardons." See La. Const.1921, art. V, § 10. From this history, it is less than clear that the language regarding offenses against the state in Art. IV, § 5 was intended to be dispositive of the question in this case. The phrase, of course, reflects the governor's lack of power to alter a federal conviction and sentence by abolishing any part of the corporal punishment or fines imposed by the federal government. Yet, nothing else should be read into that phrase implicitly, when the question shifts from federal punishment of the offense against the United States to the collateral consequences under Louisiana law.[4]
A more difficult question concerns whether a pardon's purpose is only to end the retribution and punishment against the convicted criminal or whether it may extend broadly to also restore all civil disabilities denied to him by the state. Historically, the "mercy" extended by the king, president or governor was clearly understood to end the punishment. Subsequently, other collateral consequences emerged from legislative acts placing civil disabilities on a felon, not as punishment for crime but to promote policies of protection for the public.[5] This creates the question, *1287 which is present under Art. IV, § 5(E)(1): May the pardon power, which has been historically expressed in general terms in our constitutions, be interpreted to restore those rights of citizenship?[6]
In the 1974 Constitution, the pardon power was expressed as follows:
The governor . . . upon favorable recommendation of the Board of Pardons, may commute sentences, pardon those convicted of offenses against the state, and remit fines and forfeitures imposed for such offenses.
La. Const. art. IV, § 5. This enumeration arguably only addressed the direct criminal consequences of a conviction since it does not contain language expressly lifting collateral civil disabilities which the legislature may choose to place on a felon. For some of those disabilities, a pardon was unnecessary under the original scheme of the 1974 Constitution because the restoration of the "full rights of citizenship" occurred automatically "upon termination of state and federal supervision following conviction of any offense." La. Const. art. I, § 20. The phrase "full rights of citizenship" addressed by Art. I, § 20, has been interpreted as limited to only the customary rights to vote, work and hold office. State v. Selmon, 343 So.2d 720 (La.1977).
The scope of the pardon power in the 1974 Constitution has never been challenged concerning the pardon's effect on the restoration of other collateral consequences or disabilities unrelated to the citizenship rights addressed by Art. I, § 20. Yet, because its enumeration of the pardon power is in general terms and does not expressly direct its force for the restoration of all civil disabilities imposed by legislation, such as certain state licensing requirements, the breadth of the pardon power under Art. IV, § 5(E)(1) remains unspecified, subject to future interpretation by the courts. Clearly, the historical and common understanding of pardon, to free the convicted party from sentence and end the sovereign's retribution, differs greatly from a pardon of the civil disabilities of a felon which the legislature may choose, not as retribution, but in support of important public policy.
From this review, we conclude that Art. IV, § 5(E)(1)'s general expression of the pardon does not prevail over the more specific application of a governor's pardon which was authorized by the 1998 Amendment. Ocean Energy, Inc. v. Plaquemines Parish Gov't, supra. The original intent and meaning for Art. IV, § 5(E)(1)'s pardon power did not even address the right to hold elective office because that right was expressly restored elsewhere in the 1974 Constitution on an equal basis for state and federal felons. Thus, it was only when the 1998 Amendment placed its disqualification on felons, that the people simultaneously expressed a specific and independent constitutional pardon power for the governor's executive discretion.
*1288 Turning again to the language of Art. I, § 10(B), the person convicted under the laws of the United States as a felon who "has . . . been pardoned either by the governor of this state or by" the President of the United States is no longer disqualified to be a candidate for public office. The literal language makes no distinction requiring a gubernatorial pardon for the felon convicted under state law and a presidential pardon for a federal felon like Mr. Shyne. The Governor of Louisiana is given the power to pardon a party convicted in either jurisdiction. This would not lead to a result in conflict with federal law as we have discussed. With promotion of Louisiana's policy for trustworthy elected officials being the goal of this disqualification provision, our Governor is entrusted with the power to consider the party's character and past conduct, and to grant him an earlier time for seeking public office before the expiration of the 15-year disqualification period. This result would promote a fair review of equal measure for both state and federal felons by the party with executive power whose public duty is directly for the oversight of the policy of this state. In this case, Governor Foster, on recommendation of the Board of Pardons, made that determination regarding Mr. Shyne.
On the other hand, the provision's acknowledgment of the power of the presidential pardon does not cast doubt on the propriety of a governor's pardon of a federal felon. That acknowledgment principally recognizes that a president may have intervened with a pardon to free the convicted party from federal incarceration. Such pardon under the Supremacy Clause of the United States Constitution may prevent a state from further imposing this sanction on the party. Thus, Art. I, § 10(B)'s acknowledgment of the effect of the presidential pardon for federal crimes also accepts the presidential judgment concerning the individual and avoids any challenge to our citizenship disqualifications under those circumstances involving a presidential pardon.

Conclusion
Our constitutional review begins and ends with the language of the 1998 Amendment itself. When the Amendment placed the public office disqualification upon a Louisiana citizen, it simultaneously gave the governor a pardon power for its removal. Nothing in the federal law prevents a governor from restoring the rights of citizenship which his state's law has withdrawn from a federally convicted felon. Our Louisiana governor made that choice in this case, and we hold Mr. Shyne is no longer disqualified to seek elective office. Plaintiff's suit is dismissed.
Costs of appeal are assessed to appellee.
REVERSED AND RENDERED.
PEATROSS, J., concurs with written reasons.
DREW, J., dissents with written reasons assigned by J. MOORE and with additional written reasons.
MOORE, J., dissents with written reasons.
LOLLEY, J., dissents for the written reasons assigned by J. MOORE.
MOORE, J., dissents with written reasons.
I respectfully dissent. I cannot subscribe to the majority's strained reading of La. Const. Art. 1, § 10(B), as amended in 1998, to reach the conclusion that Joe Shyne is qualified to run for public office. Although Mr. Shyne has not seriously pressed this argument, I will concede that the section is not a model of artful draftsmanship; the use of "jurisdiction" instead of "place where the person was convicted *1289 and sentenced" would have obviated this dispute.
Nonetheless, the majority's discussion is littered with fallacies. It is a fundamental principle that all constitutional provisions must be read in pari materia. Caddo-Shreveport Sales & Use Tax Comm'n v. Office of Motor Vehicles, 97-2233 (La.4/14/98), 710 So.2d 776; Chehardy v. Democratic Executive Comm., 259 La. 45, 249 So.2d 196 (1971). Article 4, § 5(E)(1) does not give the governor of Louisiana any authority to pardon federal offenses; it limits the governor's pardon power to "offenses against the state." When the voters approved the 1998 amendment to Art. 1, § 10, they added Subsection (B), "Disqualification." Any fair reading of the amendment would show an intent to limit, not to expand, the governor's pardon power. Nowhere does Art. 1, § 10(B) give the governor the right to grant full restoration of citizenship rights. The majority gives the governor boundless pardon power. Moreover, the United States constitution grants the president of the United States the power to "grant Reprieves and Pardons for Offenses against the United States." Art. II, § 2. On the basis of supremacy, neither the state constitution nor this court can derogate from the president's authority.
The majority's opinion also makes factual or legal assertions that are dubious at best. For example, the majority states that the "trial court's ruling effectively conceded that the literal wording of the 1998 Amendment allows the governor's pardon to end Mr. Shyne's disqualification from office." Absolutely nothing in the district court's opinion states this, by implication, concession, or any other way. Then, in the effort to downplay Art. 4, § 5(E)(1), the majority states that governor's pardon power "was expressly restored elsewhere in the 1974 Constitution equally for state and federal felons." (Emphasis in original.) There is no such express restoration anywhere in the constitution.
Beyond these particular faults, the majority's opinion follows the general contours of La. Atty. Gen. Op. 79-787 (3/13/80), which had advised that the denial of civil rights because of a felony conviction was a creation of Louisiana law, ergo those rights could be reinstated by Louisiana law regardless of whether the convicting jurisdiction had pardoned the offender. The district court, however, demolished this argument:
While not cited by Mr. Shyne's counsel, the Court's research reveals a series of older opinions in which the Louisiana Attorney General opines that the governor enjoys the authority to pardon federal offenses. Principal among these opinions is Opinion No. 79-787 issued by the Attorney General on March 13, 1980. The Attorney General analyzed the issue of the authority of the governor to pardon federal offenses by first noting that there was no significant difference in the pardon powers under the 1921 Louisiana Constitution and the 1974 Constitution and that "as a matter of custom and practice of longstanding in Louisiana, the governor has granted pardons to federal offenders, not pardoning the crime but removing the civil disabilities arising under Louisiana Law because of the crime." The Attorney General stated that there was no Louisiana jurisprudence on point, and relied upon general authority from other states. Those authorities apparently acknowledge that the chief executive of a state cannot fully pardon a federal offense, but assert that the executive can "grant executive clemency, effectively restoring rights of citizenship in the state to one who has been disqualified for public office or has lost *1290 other civil rights, such as a right to vote, to act as juror, to testify as a witness, etc., as a result of a conviction of crime in a federal court or in the courts of another state for which no pardon has been granted." The Attorney General continued that "It stands to reason that if Louisiana may legally withdraw certain Louisiana rights or privileges because of a person being convicted of a felony under the laws of a foreign government, another state or under federal statute, that the chief executive of Louisiana has the legal power and authority to reinstate those state rights or privileges by the granting of a pardon." The Attorney General noted that in the previous fifteen years (prior to 1980), at least eighty-seven pardons had been granted by Louisiana governors on federal offenses and concluded that:
We believe the time-honored practice under the former constitution and the new constitution has resulted in a contemporaneous construction of the meaning of "offenses against the state" to include federal and extraterritorial convictions.
In other words, prior governors have construed the provisions of the Louisiana Constitutions to the effect that convictions in federal and extraterritorial forums have resulted in offenses against the state even though the conviction is not for a violation of Louisiana law. This construction is logical inasmuch as Louisiana has inflicted punishment for such offenses by the withdrawal of certain Louisiana rights and privileges. * * *
In conclusion, when an individual commits a federal or foreign felony, certain Louisiana state rights and privileges are forfeited. It is within the power of the Governor of Louisiana to grant pardons for federal and foreign felonies, however, the effect of such pardons is only to mitigate any Louisiana collateral consequences.
The Attorney General acknowledged the Louisiana Supreme Court decision in Baxter,[7] but chose to disregard it, stating that it was "dictum" when the court stated that only the President could pardon a federal offense, as there was no pardon issued at all in that case. See also La. Atty. Gen. Ops. 80-257 and 83-558. The court notes that the 2002 Attorney General opinion addressed to Senator Malone, which renders an opinion that differs from the prior opinions, does not mention, distinguish, withdraw or overrule any of the prior Attorney General opinions were issued long before the voters amended the Louisiana Constitution in 1998.
Later, the district court criticized "inconsistent Attorney General opinions" that "create problems that eventually wind up in court." The same critique could be applied to the majority's adoption of substantially the same discredited theory.
I would affirm the judgment and the sound rationale of the district court.
DREW, J., dissenting for the reasons assigned by Judge Moore, and with additional reasons.
The trial court's opinion and my brother judge's dissent express the law admirably, and I fully adopt their reasoning, asking leave to express these further comments.
The majority opinion is admittedly erudite, yet seems to be straining at gnats (actually, mosquitoes in Louisiana) to reach this result. The only authorities not cited were Plato, Planiol, Socrates, and Will Rogers. The majority opinion "out-lawyers" *1291 itself into misapplying the will of the people, as expressed by the law of Louisiana. Reasonable people can have differences of opinion, but it seems the majority has over-complicated this dispute.
My personal philosophy is that if the people want to elect Donald Duck, they should be allowed to do so. The problem here is that my personal philosophy is in conflict with the law as I read it. Under the facts of this case, Mr. Shyne is clearly precluded from running for office until he secures a presidential (federal) pardon for this federal crime, or until the 15 years expire.
I respectfully dissent.
PEATROSS, J., concurs.
I agree with the majority that a literal reading of Article I, Section 10(B)(1) allows either the President of the United States or the Governor of Louisiana to grant a pardon ending the disqualification affecting a person convicted of a federal crime in Louisiana that also would be a felony under Louisiana state law. I concur to add alternative reasons for concluding that Article IV, Section 5(E)(1) does not limit the governor's power to pardon in this case.
Our Supreme Court has indicated in State v. Adams, 355 So.2d 917 (La.1978) and in State v. Lee, 171 La. 744, 132 So. 219 (1931), that a full pardon by the governor restores the "original status" of the pardoned individual, i.e. a "status of innocence" of crime. There can be little doubt that such a "gold seal" pardon restores all rights of citizenship because, logically, an individual restored to a "status of innocence" must have all rights of citizenship. Furthermore, logic also dictates that, if the constitution gives the governor such broad power to pardon, the governor can exercise that power to restore any subset of the rights restored by a full pardon.
Article IV, Section 5(E)(1), however, arguably restricts the broad pardoning power to "those convicted of offenses against the state." For the following reasons, I do not read this language as restricting the governor's broad pardoning power to pardoning only convictions under Louisiana state law, but read this language as authorizing the governor to pardon any offenses against the state, including a crime under the law of the United States that would be a felony in Louisiana. I agree with the statement in footnote 4 of the majority opinion that, when a Louisiana official commits an act of public bribery in this state, Louisiana has suffered the offense regardless of the fact that the official is convicted under federal law. Thus, I conclude that Article IV, Section 5(E)(1) allowed the governor in this case to remove Joe Shyne's disqualification to seek elective office.
The trial court read these provisions narrowly as a restriction on the governor's power to restore civil rights to Louisiana citizens who had such rights taken away by Louisiana law because of a conviction in Louisiana of a federal crime that also was a felony under Louisiana state law. Aside from the fact, recognized by the trial court, that restricting such power to the executive branch of the federal government "makes little sense," this narrow reading goes against the principle that laws in derogation of common law or common right should be strictly interpreted. Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097 (La. 1990). The right to seek elective office is such a right; thus, the governor's power to restore the right should be read broadly. For the same reason the disqualification added by the 1998 amendment to Article I, Section 10 should be read narrowly.
Furthermore, even if "offenses against the state" were read narrowly to include *1292 only convictions under Louisiana state law, it is doubtful that such a reading would limit the governor's pardoning power in this case. Such a narrow reading would simply make Article IV, Section 5 inapplicable; it would neither permit, nor prohibit the pardon given in this case. Therefore, if another source of law gave such power, the pardon would be effective. Article IV, Section 5(K) makes clear that the powers mentioned in Section 5 should not be read as restricting executive power; instead, the governor shall have other powers "authorized by this constitution or provided by law." A good argument can be made that another source of law gives the governor the power exercised herein.
La. C.C. art. 1 states that the sources of law are legislation and custom. La. C.C. art. 3 states that custom results from practice "repeated for a long time and generally accepted as having the force of law." Custom may not abrogate legislation, but if, arguendo, no legislative prohibition exists that addresses the pardon given herein, the governor could acquire that power through customary practice accepted as being valid.
The requirement of a practice repeated for a long time arguably is shown in Attorney General Opinion 79-787 indicating that the governor has granted pardons to federal offenders "as a matter of custom and practice of longstanding in Louisiana," and indicating that in the 15 years prior to that opinion, at least 87 pardons were granted by Louisiana governors for federal offenses. Obviously, the governor, the Board of Pardons, the pardoned offender, and the attorney general's office all understood these pardons to be effective in restoring civil rights; thus, the second requirement of La. C.C. art. 3 also arguably is met. I note that this understanding is in line with the majority opinion's quote from Am.Jur.2d.
For the foregoing reasons, I respectfully concur in the reversal.
NOTES
[1] See, Malone v. Tubbs, 36,816 (La.App.2d Cir.9/6/02), 825 So.2d 585, writs denied, 02-2322 (La.9/11/02), 824 So.2d 1164, 02-2448 (La.10/1/02), 826 So.2d 1110.
[2] An original plaintiff in this case, Max T. Malone, was dismissed from the action, and Mr. Shyne's opponent in the upcoming election, James Edward Green, is the appellee.
[3] This understanding is seen in other state interpretations of the gubernatorial pardon power for the restoration of state citizenship rights to federally convicted felons. As described in 59 Am.Jur.2d Pardon and Parole § 24:

The chief executive of a state has no power to grant a pardon for an offense against the United States for which a conviction has been had in the federal court, in the sense of taking away any part of the corporal punishment inflicted upon the offender. However, in the exercise of the pardoning power, the chief executive of a state may grant executive clemency, effectively restoring rights of citizenship in the state to one who has been disqualified for public office or has lost other civil rights, such as a right to vote, to act as juror, to testify as a witness, and so forth, as a result of a conviction of crime in a federal court or in the courts of another state for which no pardon has been granted. This remains applicable to allow a state official to restore citizenship notwithstanding that the person in question has not been pardoned or restored to the rights of citizenship by the President of the United States. (Citations omitted.)
[4] Significantly, when a Louisiana official commits an act of public bribery in this state, that crime is proscribed under our criminal statute (La. R.S. 14:118) and regardless of the fact that the official is convicted under federal law, the State of Louisiana has suffered the offense.
[5] See, e.g., various Louisiana licensing statutes restricting felons, including La. R.S. 4:150 (horse owners, trainers, jockeys and riders); La. R.S. 37:921 (registered nurses); La. R.S. 37:1437 (real estate sales); La. R.S. 37:2950 (professions and occupations); La. R.S. 37:3219 (radiologic technologists); La. R.S. 37:3396 (real estate appraisers); La. R.S. 37:3469 (wholesale drug distribution); La. R.S. 40:1235.2 (ambulance providers); La. R.S. 47:818.41 (gasoline and diesel fuel); La. R.S. 47:7005 (gaming equipment); and former La. R.S. 27:76 (gaming).
[6] We note that certain federal cases have dealt with this question regarding the presidential pardon. The pardon has been held to apply to alleviate punishment for contempt of court. Ex parte Grossman, 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527 (1925). It does not extend to require the expungement of criminal records. United States v. Noonan, supra. Likewise, a presidential pardon has been construed as not preventing the fact of the conviction from being used in consideration of federal regulatory licenses. Hirschberg v. Commodity Futures Trading Comm'n, supra. In Bjerkan v. United States, supra., the court cited Burdick v. United States, 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915), for its conclusion that "[a] pardon does not `blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law . . . ."
[7] State v. Baxter, 357 So.2d 271 (La.1978).